AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

United States of America

v.

HENRY BALDWIN LOCKWOOD III

Case No.

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ in the county of _____ in the

Southern District of Florida, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2261A | Stalking |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1030 | Fraud and Related Activity in Connection With Computers |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_Kelly DiPietrantonio_
Complainant's signature

_____ Special Agent, FBI
Printed name and title

Attested to by the Applicant in accordance

Date: December 9, 2025

City and state: Fort Lauderdale, Florida

_____ Magistrate Judge

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Kelly DiPietrantonio, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am currently a Special Agent with the Federal Bureau of Investigation, Miami Field Office. I have been a Special Agent with the FBI since May 2018. As such, I am an investigative and law enforcement officer of the United States empowered by law to conduct investigations of, and to make arrests for, certain federal criminal violations including, in part, violations of the wire fraud statute. Currently, I am assigned to the Broward County Public Corruption squad where I conduct investigations involving fraud, bribery, money laundering, and other violations of federal law. I am also a member of the Cellular Analysis Survey Team ("CAST"). My duties with CAST involve analyzing phone records to include historical and prospective cell site records, timing advance records and any other geolocation record for a variety of violations of federal offenses, including, stalking, and other violations of federal law.

2.      I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrest for offenses enumerated in Section 2516 of Title 18, United States Code. I am a law enforcement officer with authority to execute arrests and search warrants under the authority of the United States.

3.      Through my training and experience, I became familiar with the types of records, electronic and financial, that these schemes generate, and the methodologies used to perpetrate such schemes. Much of my work involved analyzing these types of records to determine the existence of criminal activity and to develop evidence. I have also received formal and on-the-job

1

training in criminal investigation procedures and criminal law. I have personally conducted numerous physical and other surveillances, including wire and electronic surveillance.

4.    The information in this affidavit is based on, among other things, my participation in the investigation described herein, consensual witness interviews, my review of relevant documents and electronic communications, information from other law enforcement officers and other individuals, and knowledge gained from my personal training and experience.

5.    I make this affidavit in support of a criminal complaint charging **HENRY BALDWIN LOCKWOOD III ("LOCKWOOD")**. As explained below, there is probable cause to believe that from in around January 2023, through in or around January 2025, in Broward County, in the Southern District of Florida, and elsewhere, **LOCKWOOD** committed violations of Title 18, United States Code, Section 2261A (Stalking); Title 18, United States Code, Section 1343 (Wire Fraud); and Title 18, United States Code, Section 1030 (Fraud and Related Activity in Connection With Computers).

6.    The information contained in this affidavit is based upon my personal knowledge and information provided to me by other law enforcement officers, witnesses, and documents. Because I submit this affidavit for the limited purpose of establishing probable cause, it does not include all of the facts that I have learned during the course of the government's investigation.

<u>PROBABLE CAUSE</u>

**Case Background**

7.    As part of this investigation, law enforcement determined that **LOCKWOOD** was a Florida state certified police officer with the Fort Lauderdale Police Department ("FLPD") located in Broward County, Florida, and had been employed as such since approximately August 2012, with his most recent assignment being in the recruiting department.

8.     In or around February 2022, and continuing through in or around April 2024, **LOCKWOOD** was engaged in a romantic relationship with an individual who will be referred to as "Individual 1." The relationship ended at Individual 1's request in an amicable manner. **LOCKWOOD** and Individual 1 did not live together during their relationship nor do they have any children with each other. During and subsequent to **LOCKWOOD** and Individual 1's relationship, **LOCKWOOD** grew close to Individual 1's family members, including Individual 1's mother, and Individual 1's brothers—specifically, Individual 1's older brother, who will be referred to as "Brother 1."

### Stalking (18 U.S.C. § 2261A)

*Purchase of GPS Trackers*

9.     Law enforcement learned, pursuant to federal grand jury subpoenas, **LOCKWOOD** purchased a Global Positioning System ("GPS") tracker from BrickHouse Security ("BrickHouse") on or about March 22, 2023 ("Tracker 1"), which was delivered directly to **LOCKWOOD**'s residence. On or about November 9, 2023, **LOCKWOOD** called BrickHouse via his cell phone, claiming that Tracker 1 fell off the vehicle **LOCKWOOD** had previously affixed it to and was lost. As a result of **LOCKWOOD**'s claims that Tracker 1 was lost, BrickHouse sent a new GPS tracker to **LOCKWOOD** on or about November 13, 2023 ("Tracker 2"). Additionally, BrickHouse advised **LOCKWOOD** that they would remove Tracker 1 from **LOCKWOOD**'s account and replace it with Tracker 2.

10.     On or about March 4, 2024, **LOCKWOOD** again called BrickHouse via his cell phone. During this recorded call, **LOCKWOOD** questioned why Tracker 1 was not currently transmitting despite being with him and fully charged. BrickHouse advised **LOCKWOOD** that Tracker 1 was deactivated due to **LOCKWOOD**'s claim that it was lost during the November

3

2023 phone call. BrickHouse requested that **LOCKWOOD** confirm whether he still had access to Tracker 2. After confirming that he still had access to Tracker 2, **LOCKWOOD** was asked if he would like to add a subscription for Tracker 1, in addition to the subscription he wanted to maintain for Tracker 2. **LOCKWOOD** confirmed that he wanted to add a subscription for Tracker 1 and confirmed he had possession of both trackers, despite having stated that he lost Tracker 1 months earlier.

*Use of the GPS Trackers*

11.     On or about June 4, 2024, during a recorded call with BrickHouse, **LOCKWOOD** requested a reboot of Tracker 1 and Tracker 2 because **LOCKWOOD** believed they were not recording a correct location. During this call, BrickHouse advised Tracker 1 was currently located at an address in Coconut Creek, Florida, which your affiant respectfully submits was the location of Individual 1's employment at that time. I believe, based on my training and experience, Tracker 1 was placed on Individual 1's vehicle for purposes of **LOCKWOOD** placing Individual 1 under surveillance.

12.     BrickHouse maintained full tracking histories for Tracker 1 and Tracker 2 from on or about July 29, 2024, through on or about April 7, 2025.

13.     Either Tracker 1 or Tracker 2 reported being in or around the immediate vicinity of Individual 1's residence on or about the following dates: July 29, 2024; July 30, 2024; July 31, 2024; August 1, 2024; August 2, 2024; August 3, 2024; August 4, 2024; August 5, 2024; August 6, 2024; August 7, 2024; August 8. 2024; August 9, 2024; August 10, 2024; August 11, 2024; August 12, 2024; August 13, 2024; August 14, 2024; August 15, 2024; August 16, 2024; August 17, 2024; August 18, 2024.

4

14.     Either Tracker 1 or Tracker 2 reported being in or around the immediate vicinity of Individual 1's employment on or about the following dates: June 4, 2024; July 30, 2024; July 31, 2024; August 1, 2024; August 2, 2024; August 5, 2024; August 6, 2024; August 7, 2024; August 8. 2024; August 9, 2024; August 12, 2024; August 13, 2024; August 14, 2024; August 15, 2024; August 16, 2024.

15.     Either Tracker 1 or Tracker 2 reported being in or around the immediate vicinity of Brother 1's residence on or about the following dates: August 1, 2024; August 4, 2024; August 10, 2024; August 11, 2024.

16.     On or about August 10, 2024, approximately five months after **LOCKWOOD** and Individual 1 ended their relationship, Individual 1 visited a lounge in Hollywood, Florida. On or about the night of August 10, 2024, Brother 1 called Individual 1 asking if she wanted to meet up. Individual 1 asked Brother 1 who he was with, and Brother 1 advised that he was with **LOCKWOOD**. Individual 1 refused the invitation without advising Brother 1 or **LOCKWOOD** where she was located. Subsequently, Brother 1 and **LOCKWOOD** arrived at the lounge where Individual 1 was, which was in an area she rarely frequented. Additionally, Individual 1 advised that she did not share her location with Brother 1 and was not a part of any location sharing applications. As noted above, the information provided by BrickHouse showed that on or about August 10, 2024, Tracker 2 reported locations in and around the vicinity of Individual 1's residence, Brother 1's residence and additionally was in Hollywood, Florida.

17.     On or about Friday, August 16, 2024, at approximately 1:12 p.m., Individual 1 brought her 2020 silver Hyundai Elantra—the same car she drove to the Hollywood lounge on the night of August 10, 2024—to an Automotive Business located in Coconut Creek, Florida, and requested that mechanics inspect her vehicle for any tracking devices. Upon inspection, a service

technician ("the Technician") put Individual 1's car on a lift and identified a tracker affixed near the rear of the vehicle. The Technician removed the tracker, took a photograph of it, and subsequently placed it on his toolbox. The photo taken by the Technician is reproduced here:



18.     Continuing on or about August 16, 2024, at approximately 3:16 p.m., **LOCKWOOD**, while on duty and wearing his blue dress police uniform pants, was seen on CCTV footage arriving at the Automotive Business, which is outside of FLPD's jurisdiction. At 3:43 p.m., **LOCKWOOD** exited his vehicle and entered the service bay of the Automotive Business, walking past a sign that stated: "NOTICE" and "EMPLOYEES ONLY BEYOND THIS POINT." It should be noted that Individual 1 never told **LOCKWOOD** she was going to the mechanic to get her vehicle inspected prior to doing so. A screenshot of the CCTV footage and a photograph of the sign is below:

6





19.     **LOCKWOOD** was seen on CCTV footage walking into the service bay area—a point beyond where he was permitted to be—and around Individual 1's vehicle. A few minutes later, **LOCKWOOD** walked away from Individual 1's vehicle and exited the service bay holding

7

the vehicle tracker while appearing to be on his cell phone. A screen shot of the CCTV footage is below:



20. On or about August 16, 2024, Tracker 1 reported locations in and around the immediate vicinity of Individual 1's residence, Individual 1's place of employment and the Automotive Business.

21. BrickHouse maintains logs of each time one of its subscribers logs onto their account. From on or about July 24, 2024, continuing through on or about January 22, 2025, **LOCKWOOD** logged onto his BrickHouse account approximately 339 times.

22. As a result of locating a tracker on her vehicle, Individual 1 decided to purchase a new phone with a new phone number due to fear of **LOCKWOOD**. Individual 1 took other steps to protect herself, such as leaving her home to stay with a friend and filing a police report because she was scared and wanted the recent events documented.

8

**Fraud and Related Activity in Connection With Computers (18 U.S.C. § 1030)**

23.     **LOCKWOOD**, in his capacity as a FLPD police officer, had access to the Florida Department of Motor Vehicles and Highway Safety Driver and Vehicle Information Database ("DAVID"). On multiple occasions, including but not limited to April 17, 2024, through August 19, 2024, **LOCKWOOD** queried individuals' license plates, driver licenses and/or vehicle identification numbers (VINs) via DAVID on his government issued or protected computer without an authorized purpose. Some of those unauthorized queries include the following:

A. On or about April 17, 2024, **LOCKWOOD**, while off duty and on vacation, queried the license plate of a 2016 Mercedes Benz previously owned by Individual 1. The title was transferred from Individual 1 to the new owners in or around September 2017. The new owners advised law enforcement in an interview that they did not know **LOCKWOOD**, had no reason as to why **LOCKWOOD** would know or check either of their social security numbers, and never authorized **LOCKWOOD** to run the license plate of their vehicle or their driver's license numbers.

B. On or about April 17, 2024, **LOCKWOOD**, while off duty and on vacation, queried the name of the owner of a 2017 Mercedes Benz that was previously owned by Individual 1. The title was transferred from Individual 1 to the new owner in or around February 2020. The new owner lives in another state, outside of FLPD's jurisdiction.

C. On or about April 25, 2024, **LOCKWOOD**, while off duty, queried the license plate, driver's license number, name and VIN of a vehicle belonging to another individual. That individual advised law enforcement that they did not know **LOCKWOOD** nor did they have any reason why **LOCKWOOD** would know who

they were or run their information. That individual lives in an area over 200 miles away from Fort Lauderdale, outside of FLPD's jurisdiction.

**Wire Fraud (18 U.S.C. § 1343)**

*The Fort Lauderdale Black Police Officers Association*

24.     The Fort Lauderdale Black Police Officers Association ("BPOA") is a 501(c)(3) organization that is comprised of police officers and civilians who are dedicated to providing justice, fairness, and effectiveness in law enforcement. In addition to being a member of the BPOA, **LOCKWOOD** was also the treasurer on the board of the BPOA, a position he held since prior to 2024. In his capacity as treasurer, **LOCKWOOD** managed the funds of the BPOA.

25.     The BPOA typically recruits its members out of the police academy and maintains their funding via members' dues which are bi-weekly withdrawals directly from members' paychecks, which then get deposited into the BPOA's bank account. Each members' dues are taken out directly from their paychecks at the direction of a payroll specialist for the City of Fort Lauderdale (hereinafter referred to as "the City"). In 2024, the bi-weekly collection of dues amounted to approximately $418.50. **LOCKWOOD** was one of two authorized signers, dating back to July 3, 2020, on the BPOA bank account, which was maintained by Wells Fargo.

26.     On or about April 23, 2025, law enforcement conducted an interview with T.S., who is the president of the BPOA. T.S. advised that on or about April 9, 2025, she received an email from a Payroll Specialist for the City, inquiring about two overpayments made by the City to the Wells Fargo BPOA bank account in January 2024, which totaled $56,419.44. Included in the email from the Payroll Specialist to T.S. was a prior email thread between the Payroll Specialist and **LOCKWOOD** that took place from on or about January 31, 2024, and continued through on or about March 11, 2024. That email exchange is described below:

10

A.  On or about January 31, 2024, the Payroll Specialist emailed **LOCKWOOD**, via **LOCKWOOD**'s FLPD-issued government email address, and advised **LOCKWOOD** that on January 2, 2024, and January 6, 2024, the City submitted an overpayment to the BPOA. The Payroll Specialist requested that the overpayment be sent back.

B.  On or about January 31, 2024, **LOCKWOOD** responded to the Payroll Specialist and advised that in reviewing the BPOA records, he noticed the error, and confirmed the correct amount would have been $418.50 each for the periods that the payments related to.

C.  On or about January 31, 2024, the Payroll Specialist confirmed that was correct and provided a report for both pay periods.

D.  On or about February 6, 2024, the Payroll Specialist sent an email following up on the prior correspondence.

E.  On or about February 7, 2024, **LOCKWOOD** responded with the following two statements and requested the Payroll Specialist confirm their accuracy: (1)"BPOA Received $28,209.72 on 01/12/24, the correct amount should have been $418.50, a repayment for this pay period from the BPOA will be $27,791.22 Check number 1052"; and (2) "BPOA Received $28,209.72 on 01/29/24, the correct amount should have been $418.50, a repayment for this pay period from the BPOA will be $27,791.22 Check number 1053."

F.  On or about February 7, 2024, the Payroll Specialist confirmed those statements and amounts were correct.

G.  On or about February 15, 2024, the Payroll Specialist requested confirmation that

11

the overpayment checks had been sent by **LOCKWOOD**.

H. On or about February 20, 2024, **LOCKWOOD** advised the Payroll Specialist that the checks were sent to the Fort Lauderdale City Hall and requested that the Payroll Specialist notify **LOCKWOOD** should they not receive them that week.

I. On or about March 1, 2024, the Payroll Specialist advised **LOCKWOOD** that they had not received the checks and requested that **LOCKWOOD** place a stop order and then reissue the checks. The Payroll Specialist advised **LOCKWOOD** that he could send the checks via interoffice mail.

J. On or about March 11, 2024, **LOCKWOOD** sent an email to the Payroll Specialist which stated: ". . . sorry for the delay but our new email server system is not working the best I see. Check number, 1052 and 1053 had a stop placed on them do to the delay. Check number 1055 and 1056 have been reissued to you via inter-office. If those are the checks you have your good to go."

27. Your affiant has reviewed subpoenaed records from Wells Fargo for the BPOA account, which show that **LOCKWOOD** in fact never sent check numbers 1055 and 1056 to the Payroll Specialist, as he claimed in the March 11, 2024 email.

28. According to subpoenaed bank records from Wells Fargo for the BPOA account, check number 1055 was issued to an individual with the initials "C.S." on July 12, 2024, for $324.00, and contained the memo "teen summit." The check was signed by **LOCKWOOD**. Additionally, during the execution of a search warrant of **LOCKWOOD**'s residence on June 6, 2025, the carbon copy of check number 1055 was found in **LOCKWOOD**'s residence, further contradicting the claims he made via email. A redacted photograph of that check is pictured below:



29.     Subpoenaed records from Wells Fargo for the BPOA account further show that check number 1056 was issued to an individual with the initials "L.C." on July 12, 2024, for $243.00, and contained the memo "teen summit." The check was signed by **LOCKWOOD**. During the previously mentioned search at **LOCKWOOD**'s residence, law enforcement also located the carbon copy of check number 1056. A redacted photograph of that check is pictured below:



30.     On or about April 9, 2025, the Payroll Specialist emailed T.S., the president of the BPOA, the following: "I am reaching out regarding an overpayment made by the City of Fort Lauderdale to FLBPOA in January 2024. Detective Henry **LOCKWOOD**, our point of contact, was made aware of this overpayment at the time. As part of the resolution process, Detective **LOCKWOOD** submitted two checks to the City of Fort Lauderdale. However, the checks we received and subsequently deposited were marked with a stop payment by FLBPOA. (Please see

below email correspondence for reference.) As a result, the funds remain outstanding to the City of Fort Lauderdale. We would appreciate if you can review this matter and provide guidance on how to proceed with resolving the issue." Also attached to the email was a screenshot of the stop payment for check numbers 1052 and 1053 that had been deposited on March 8, 2024."

*Misappropriated BPOA Funds for* **LOCKWOOD**'s *Benefit*

31.     Throughout most of 2024, when T.S. was the president of the BPOA, T.S. attempted to meet with **LOCKWOOD** and go to Wells Fargo and have herself added as an authorized signer on the BPOA account. However, **LOCKWOOD** consistently appeared to avoid the efforts by T.S. to do so. Additional board members of the BPOA similarly attempted to meet with **LOCKWOOD**. At some point, **LOCKWOOD** told T.S. she could go online and look at the BPOA account held at Wells Fargo in a "view only" capacity. Your affiant respectfully submits that this is not a service offered by Wells Fargo.

32.     During monthly BPOA meetings with board members, **LOCKWOOD** would brief members on the BPOA's financial status. When doing so, **LOCKWOOD** did not share actual bank statements but rather would use spreadsheets with summaries of the account that he created himself and that were later uploaded to the shared BPOA Google Cloud server. Google Cloud servers are located in a global network of regions and availability zones, with specific data centers in numerous countries across North America, Europe, Asia, and South America. Specifically in the United States, Google servers are located are in Iowa, South Carolina, Virginia, Ohio, Texas California and Utah.

33.     T.S. eventually successfully met with **LOCKWOOD** on or about February 25, 2025. At this meeting, **LOCKWOOD** handed T.S. an envelope with documents related to the BPOA, including spreadsheets titled "statements of account" and printed versions of the Wells

14

Fargo BPOA bank statements from 2024.

34. Upon comparing the bank statements provided by **LOCKWOOD**, the statement of account spreadsheets created by **LOCKWOOD**, and the subpoenaed bank statements from Wells Fargo, law enforcement found many inconsistencies.

35. For example, the January 2024 "statement of account" and printed bank statement that **LOCKWOOD** gave to T.S. do not accurately reflect the subpoenaed bank statement for that same month and are also inconsistent with each other. The January 2024 bank statement that **LOCKWOOD** gave T.S. reflects a deposit/credit of $418.50 on January 12, 2024, and a deposit/credit of $418.50 on January 26, 2024, from the City of Fort Lauderdale, which would have been consistent with the normal bi-monthly dues for BPOA. However, the January 2024 bank statement provided to law enforcement pursuant to a grand jury subpoena reflects a deposit/credit of $28,209.72 on January 12, 2024, and a deposit/credit of $28,209.72 on January 29, 2024, from the City of Fort Lauderdale, which is consistent with the email exchange **LOCKWOOD** had with the Payroll Specialist described above. Based on a review of all of the records, **LOCKWOOD** took steps to conceal the overpayments made by the City of Fort Lauderdale.

36. January 2024 was not the only month where the spreadsheet and printed bank statements provided by **LOCKWOOD** were inconsistent with the subpoenaed business records. The below table includes the ending balance shown on each of the aforementioned documents each month, which illustrates the discrepancies between the documents:

| Month | Ending Balance from "Statement of Account" Spreadsheets | Ending Balance from Printed Statements Provided by LOCKWOOD | Ending Balance from Wells Fargo Official Records |
|---|---|---|---|
| January 2024 | $22,046.24 | $22,486.24 | $51,582.17 |
| February 2024 | $15,855.02 | $20,389.76 | $35,722.78 |
| March 2024 | $16,344.02 | $20,878.76 | $31,210.79 |

| April 2024 | $16,708.19 | $21,242.93 | $25,347.14 |
|---|---|---|---|
| May 2024 | $17,870.71 | $22,036.45 | $485.62 |
| June 2024 | $18,422.11 | $21,61.85 | $683.94 |
| July 2024 | $3,388.33 | $25,360.22 | $2,557.31 |
| August 2024 | $4,318.33 | $25,031.22 | $14,738.12 |
| September 2024 | $5,673.33 | $26,386.22 | $4,879.23 |
| October 2024 | $4,575.75 | $33,439.92 | $7,291.12 |
| November 2024 | $5,605.05 | $52,187.34 | $11,911.14 |
| December 2024 | $0.00 | $20,274.34 | -$9.99 |

37.     During this investigation, law enforcement also found that there were misappropriations by **LOCKWOOD** from the BPOA account going back as early as January 2023, which include but are not limited to: (1) approximately $61,267.75 from the BPOA account used to pay **LOCKWOOD**'s personal American Express; (2) approximately $17,781.13 from the BPOA account transferred to "**LOCKWOOD** III Security Inc.," a personal business owned and maintained by **LOCKWOOD**; (3) approximately $9,666.00 from the BPOA account used to pay "Consuegra & Duffy Creditors Rights" on behalf of **LOCKWOOD**; and (4) approximately $5,079.64 from the BPOA account used to pay **LOCKWOOD**'s personal Mastercard.

38.     Additionally, **LOCKWOOD** used the BPOA account to make improper personal purchases, for example, at liquor stores, groomers, cleaners, pharmacies, GNC, and companies that sell GPS devices, on multiple occasions spanning multiple years. Law enforcement's investigation has uncovered approximately $150,000 worth of BPOA funds that **LOCKWOOD** used for personal expenses which he knowingly took steps to conceal.

**CONCLUSION**

39.     Based on the foregoing facts, your affiant submits there is probable cause to support this criminal complaint charging **HENRY BALDWIN LOCKWOOD III** with violations of Title

18, United States Code, Section 2261A (Stalking); Title 18, United States Code, Section 1343 (Wire Fraud); and Title 18, United States Code, Section 1030 (Fraud and Related Activity in Connection With Computers).

FURTHER AFFIANT SAYETH NAUGHT.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by FaceTime     this 9th day of December 2025, in Fort Lauderdale, Florida.

_____
HONORABLE JARED M. STRAUSS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF FLORIDA